The United States Court of Appeals for the Federal Circuit is now open for discussion. The first case this morning is number 07-1198, Nielsen v. Osram Sylvania. Mr. Smith. Thank you, Your Honor, and may it please the Court. This Court has made clear that a finding of inequitable conduct in a patent case does not automatically mean that there should be an award of attorney's fees under Section 285. It must be further showing that, under all the circumstances of the case, it would cause gross injustice not to follow the usual American rule that each side bears their own attorney's fees. Here, we submit it was an error for the District Court to award attorney's fees under 285 for two basic reasons. First, as this Court's merits opinion reflects, the evidence of actual intentional misconduct here was exceedingly thin, although sufficient to allow affirmance under a very deferential standard. In addition, and indeed this is a separate point that is important to understand, the particular findings of inequitable conduct at issue here were not the kind that allow you to conclude that it was the conduct that caused the issuance of the patents. Even if all of that conduct had not occurred on the facts of this case, it's quite clear that Mr. Nielsen would have been able to obtain substantially the same patent protection. So it wasn't the inequitable conduct that caused Osram Sylvania to be exposed to the attorney's fees. Isn't there an issue, though, of litigation misconduct? Mr. Nielsen sued under, what, 26 patents and only dropped 15 of them, was it, just before trial, after a lot of work had been done? Well, Your Honor, the facts are quite different from that. He dropped all but two of them two years before trial. There were two more that were dropped on the eve of trial. There was a formality of dropping some more than that on the eve of trial, but the expert reports, the summary judgment motions, everything made very clear for two years before the trial that they were down to 13 patents. And then he dropped two more in, you know, five. Is it correct that he didn't specify which claims were infringed until near the end of the, up until trial? No, no, it's not correct at all, Your Honor. He didn't specify in the complaint back in 2000, but in 2003 he put out claim charts, as the court schedule provided, in which he specified all of the particular claims that he was relying on under what was then 26 patents. And then very soon thereafter it went down to 20 and eventually went down to 13. In other words, it wasn't until three years after suit that he indicated which claims were infringed? That was when the claim chart was first filed under the schedule of the case, yes, Your Honor. Now, there was no order, as far as I'm aware, or any rule of law that says as of a particular deadline prior to that you had some duty to identify particular claims. Discovery goes both ways. He had to learn about the devices as well of the defendant and figure out exactly which ones were his strongest arguments. Well, isn't that part of the issue? If he hadn't yet learned about the nature of the accused devices and he brought these suits under 25, 26 patents and he wasn't sure that they were infringed? Well, Your Honor, there's a difference between having a basis for filing suit and knowing exactly which claims ought to go against exactly which devices. That's why you have a discovery process. And the idea that a $5.6 million sanction should be awarded here because he didn't name the claims until 2003, which was years before trial, makes no sense, I submit. And there's certainly no case that anybody cited suggesting that he should have known to do that or that the lawyers, in fact, should have known to do that or that the district court required them to do that. That's an extraordinarily draconian sanction. The other findings of litigation misconduct, I submit, are so weak that they bear up under no scrutiny at all. So at a minimum, I think we need a reweighing of the equities here because a lot of what's called litigation misconduct simply is factually inaccurate. There wasn't anything close to what the district court said happened. But let me go back to the inequitable conduct thing. With respect to this, what's critical here in many respects is two things. One, the materiality was very low with respect to the nondisclosures and the misstatements that he was accused of in this situation. For example, on the 270 patent, which covers the compact fluorescent lamp, the thing that's going to replace every incandescent bulb in the world in the next 10 years, the only finding of inequitable misconduct on the patent that covers that, the 270 patent, was that he underpaid small entity maintenance fees after the fact by $5,000. But that patent has been rendered unenforceable under this court's rulings, and I accept that. But the idea that the misconduct there caused the exposure to attorney's fees is wrong. He had the patent. He didn't do anything in obtaining that patent that was inequitable. He simply made a mistake after the fact. And that's true with respect to the Motorola case. That's true with respect to the priority misclaims, which he never relied on. Essentially, what happened here is that the inequitable conduct didn't cause the exposure to attorney's fees. It was a great boon to Osram Sylvania. It gave them a way to get out from under extraordinarily large liability claims, exposure to infringement claims, and left them with a windfall. So the real issue here is ultimately whether you're going to, having found that they get that windfall, give them an additional $5.6 million in attorney's fees, and you'd be taking them away from this inventor who, as the court's own opinion reflects, made some extraordinary misjudgments about whether he should have a lawyer and proceeded, pro se, prosecuting all of these patents, made some mistakes. The court found them, the district court found them to be intentional, but the evidence was quite thin with respect to intent, in part because much of what he was accused of doing on purpose was irrational. If he had known that these small entity payments were improper, would he have done that on purpose when the patents were already in litigation and they were worth tens if not hundreds of millions of dollars? It just doesn't make any sense. Now, I'm not trying to relitigate the merits, but I do think under this court's jurisprudence at the attorney's fees phase, you can take into account whether the case was a close case. The court said that over and over again. Whether the evidence was clear or not. And this court's opinion reflects that there was lots of reason to think much of what happened here was inadvertent, and it was the whole collection of everything together that was what led the court to ultimately decide to go ahead and defer to the district court's assessment of the merits. But that, I think, is something that you can now take into account in the interest of justice and in the interest of drawing a distinction between inequitable conduct issue and the fee issue and say this is a place where the district court shouldn't have gone ahead and just awarded fees just because inequitable conduct occurred. There isn't any gross injustice in following the American rule in this situation. Indeed, quite the contrary. Osram Sylvania, a very large corporation, is sitting pretty with the right to sell these compact fluorescent lamps without any infringement liability and was benefited magnificently by the fact that this misconduct occurred. The patents would still have been issued. And so to say that this is a case in which it would be a gross injustice not to require the plaintiff to pay his attorney's fees, to pay attorney's fees to Osram Sylvania, just doesn't make sense to us, Your Honor. With respect to the other kinds of litigation misconduct that the district court relied on here, we have, for example, this notion that he suddenly invoked an advice of counsel defense at trial without having previously invoked a privilege to block questioning about what the lawyer's advice was about whether this was a proper nonprofit. But there's no example of that that anybody cited. If you look at what Osram Sylvania cites in their red brief as supposedly the place in the deposition where privilege was invoked, it had nothing to do with the advice of counsel with respect to whether GEO was a valid nonprofit. There is no place where that occurred. The district court said it occurred, but it didn't occur. Similarly, this notion that somehow there was this great impropriety in producing these checks that Mr. Nilsen had written to his law firm during the trial, that arose because at trial, for the first time, Mr. Nilsen was accused of raiding the kitty and taking money out of the GEO Foundation and putting it in his pocket. And the reality was this was reimbursement for legal fees, which he had paid on behalf of GEO to the lawyers. So they went back and they found the checks that Mr. Nilsen had written to the lawyers, which dollar for dollar added up to the money that had come out of the GEO Foundation. And they came back to court in the middle of the trial and said, we'd like to make these exhibits to show you that that accusation we heard last week is not true. And the court accepted it. But somehow that that became litigation misconduct is incomprehensible to us, Your Honor. So these are the kinds of reasons I think that this is an unusual case. I realize it's going to be a rare case in which this court is going to reverse a grant of attorney's fees in an equitable conduct case. But this is a very unusual case. It's true that there were quite a few different findings of inequitable conduct all in the case. But to rely on that is in many ways a kind of double bootstrapping, because it was only by putting all of them together that Osram Sylvania was able to make the case stand up on appeal. And then if you then take the fact that there's all those different accusations in the case and say, well, that's the reason why you have to award fees, you're basically giving them a double benefit from having collected up a whole variety of very technical issues that didn't ultimately affect the ability of Mr. Nilsen and the GEO Foundation to get the patent protection that they were asserting in this case. And the point with respect to that that I want to emphasize is not just the small entity payments, which, of course, come after the prosecution and don't affect patentability. It's the priority misclaims. They may have been improper. They may have been intentionally improper. He never relied on them, so it didn't affect patentability in the prosecution. When he was shown prior art, he could have said, well, my applications antedate that because I have claims all the way back to 1978. He didn't do that. So, again, we can say with a moral certainty that that misconduct did not affect his ability to get these patents. The same with respect to the Motorola case, the non-citation of the Motorola case. It was technically improper because there was a rule in the MPEP that two cases of the same subject matter, you've got to tell the examiner about it. But there's never been any claim that anything actually happened in the Motorola case that would have been of any consequence in the prosecution of these patents. It was a technical violation that didn't affect the actual issuance of any patent. Even with respect to the non-citation of prior art, that affected, certainly that's not a substantial matter, and it affected potentially the issuance of up to three of these patents. But the other eight, the prior art issue doesn't even apply to. So there would have been patents covering electronic ballasts, covering compact fluorescent lamps. There would have been this lawsuit. There would have been these fees, regardless of whether any of the misconduct at issue here occurred. And in that situation, there isn't any reason to depart from the American rule. The American rule is you get sued, you win, you pay your own lawyers. And there's an exception created in Section 285, but it is a narrow exception. This court has emphasized in the J.P. Stevens case that even when inequitable conduct is found, the burden of justifying a fee award remains on the prevailing defendant. There is still a presumption against it. And the court has again and again affirmed district courts that have denied attorneys' fees in inequitable conduct cases, either because they found that the case is not exceptional or because they've exercised their discretion not to do it. And in this situation, where the district court's perception of the case was obviously very different from this court's perception of the case, this court's perception of the merits was it was a close case. There was lots of reason to think maybe some of this or much of this was inadvertent, but you went ahead and affirmed. In that situation, it seems to us you ought to be willing to be rather aggressive in reviewing the district court's determination that fees were appropriate on top of everything else that had been done to Mr. Nilsen to punish him for this misconduct. He has lost the ability to enforce patents that are worth a huge amount of money in the current marketplace. And for him to also have to pay out of his own pocket now, or the GEO Foundation out of their pocket, the $5.6 million, it seems to us, is just inequitable. And it is ultimately an equitable decision this court has to make. There are no further questions. Thank you for your attention. OK. We'll save the rest of your time, Mr. Smith. Thank you, Your Honor. Mr. Smith. Thank you, Your Honor. It may have pleased the court. The judgment below should be affirmed because the district court did not commit a clear error in finding this to be an exceptional case, nor did it abuse its discretion in deciding to award attorney's fees. The district court found that Mr. Nilsen engaged in a protracted, broad pattern of inequitable conduct over the course of decades. And, in fact, the district court found- Well, it's hardly a pattern. These were all separate individual items. They were separate, Your Honor, but I would point to Your Honor's opinion in the underlying case, in which you said that what we have here is a collection of problems that are so broad. In fact, Your Honor said this case presents a collection of such problems. Are you going to tell me that I used the word pattern? No, no. You did not. I would not purport to tell you what you wrote in your opinion, Your Honor. But what you said, the district court evaluated thoroughly and considered, including making credibility findings, and it concluded that the record of testimony indicated repeated attempts to avoid playing fair and square with the patent system, repeated attempts to avoid playing fair and square. I would submit to Your Honor that that is a classic exceptional case. That is the classic situation in which the district court has the discretion to award fees. And, in fact, I think it's also important to point out- You're saying that our summary of the evidence is itself evidence of inequitable conduct? No, Your Honor. I'd say that what your summary of the evidence is is that it affirmed the district court's underlying factual findings, that Mr. Nilsen had engaged in at least five different forms of inequitable conduct before the patent office. And that was, in fact, the principal basis for the district court's conclusion that this was an exceptional case. This court has repeatedly held that findings of inequitable conduct, frivolous litigation, bad faith conduct of the litigation, such as filing an excessive number of patents and then withdrawing them later in the case, are the classic examples of factual situations that will support an inequitable case finding. In fact, in the Brasler case, this court specifically held that the prevailing party, here Osram, may prove the existence of an exceptional case by showing inequitable conduct before the PTO, litigation misconduct, vexatious, unjustified, or otherwise bad faith litigation. And that's exactly what the district court found here. Indeed, I don't think Mr. Nilsen has cited, nor could we locate, a single decision by this court in which the district court found inequitable conduct, found the case to be exceptional, and the court then said that that was a clear error. We could not find any such decision in which there was an underlying inequitable conduct decision affirmed by this court with an exceptional case finding, and this court said, well, nevertheless, that's clear error. So I would suggest that the district court's underlying exceptional case finding, which, of course, is the first step in the analysis, cannot be reversed because it doesn't constitute clear error. In fact, given the facts here, I think it falls squarely within this court's precedent. The second issue, which- Do you believe that if, in fact, a plaintiff cites initially more patents than he ultimately litigates, that that's grounds for departing from the American rule? No, not in all circumstances, Your Honor, but I think the facts here are particularly egregious. As we pointed out in our brief, Mr. Nilsen originally sued on 26 patents without specifying any claims, which I understand he's permitted to do under our notice pleading standard, but he then took over two years to identify the specific claims that he was asserting. And when he did that- Now, Mr. Smith says that this was in accordance with the schedule set in the district court. Yes, and if I may, he did not comply with the court schedule. What he did, instead of identifying the specific claims in the 26 patents, he tried to increase the number of asserted patents to 41. So, in other words, the court set a scheduling order that said, identify which specific claims and which patents you're asserting. Instead of complying with the district court's order, what Mr. Nilsen did was he tried to add, without leave of court, 15 additional patents. And so he tried to go from 26 to 41. Now, is that litigation misconduct? I think it is, and I think the district court found that to be. The district court struck that and instructed him to go back and limit his claims to the 26 that he was originally serving. So you think that, in general, the way patents appear to be litigated, at least the ones that reach us, all warrant departure from the American rule? No, Your Honor. I would never purport to say that there's a per se rule. I think each case must turn on the facts and circumstances of each case. And I think it's certainly true here that the district court was not making its exceptional case an attorney's fees decision based only on the litigation misconduct. In fact, you have to look at the totality of Mr. Nilsen's misconduct. Well, your premise is, of course, that it's misconduct to add claims during the litigation, during patent litigation, or to add patents. I'm really trying to think through the stage at which the misconduct begins. When one amends a complaint to add additional patents, when one amends the complaint or doesn't amend the complaint, and says, I'm not going to litigate all of those patents, if all of those are, in fact, litigation misconduct, I think the bar needs to know. Well, I think, Your Honor, and again, I would not purport to set a specific rule. I think under the facts here, what the district court found was that Mr. Nilsen should have known at the time he filed suit he's required to conduct an adequate pre-suit investigation and have a good faith basis for identifying which patent claims he was going to be asserting against which products. By delaying that for more than two years, and then not complying with the court's scheduling order, he necessarily caused Osram to incur substantial fees trying to investigate and defend against, literally, hundreds of claims that weren't ultimately asserted in the case. Double that, Your Honor, with the fact that once he finally did assert his claims in compliance with the court's scheduling order, he then caused another two to three years of intense and extensive attorney's fees while we investigated that. And he waited, literally, until right before trial to withdraw those claims formally. And that, I think, is what was so troubling to the district court, that he caused Osram unnecessarily and needlessly to incur substantial litigation expenses that they shouldn't have incurred. And I would point out- How many did he withdraw just before trial? Fifteen, Your Honor. Fifteen patents. Fifteen just before trial? Yes, and the exact date, I think, Your Honor- The opposing counsel said, what, two? Well, Your Honor, he withdrew, I believe it was in October, he withdrew 13 or 14 and then another one patent shortly before the December trial date. And so when we were preparing for the inequitable conduct trial, we were originally preparing on 26 patents. And let me make one point on that. Mr. Smith says, well, we withdrew these in our summary judgment motions, in our expert reports, but we had a declaratory judgment claim seeking a declaration of unenforceability. And so we were entitled to continue to pursue those. It wasn't until they formally filed a- they actually filed a covenant not to sue that we were then in a position to know for sure that they weren't going to assert those. That's why the district court found it so troubling. Did I hear you tell me that the reason some of these claims were not withdrawn earlier was because they were subject of your counterclaim? Well, they purport, Your Honor, to have withdrawn them. I would submit that they didn't officially do that. And the way you know that- What do you mean? But did they unofficially do it? I would say no. They are now- I'm not asking for your opinion. I'm asking for what happened. I think the answer is no, Your Honor. What happened was it wasn't until they submitted a statement of non-liability for those 15 patents shortly before trial that those patents were officially removed from the case. And, in fact, I would suggest to you that they knew that, otherwise they wouldn't have submitted the statement of non-liability. Why else would they do that shortly before trial if they didn't think that they needed to make an official notification to both the OSRAN and to the court that those patents were being withdrawn? But, meanwhile, the patents were still in play because of your counterclaim? Yes, at least. And because we weren't sure that they had withdrawn them. We didn't believe they had. And so they had to be in play. And we continued to incur fees and expenses. But on the counterclaim, didn't they have to defend against the counterclaim? Yes, Your Honor. But the point is those patents weren't withdrawn until shortly before trial. Your Honor, on the- You didn't withdraw the counterclaim? No. It wasn't dismissed until after the inequitable conduct case was over. All the remaining counterclaims were dismissed as moot, except for the ones- I can't hear you telling me that patents that they had said they weren't going to pursue were kept in play because they were placed at issue in the counterclaim. Well, they remained at least an issue because of the counterclaim, Your Honor. Yes. With respect- I think I've answered your question. I'm not sure. Have I answered your question, Your Honor? I think so. Okay. With respect to the fee award, Your Honor, let me just turn to that. It's important to understand that the court evaluated the totality of Mr. Nilsen's conduct all the way through from the time he was in the PTO, during the litigation, through the trial. When he was in the PTO, the court found that Mr. Nilsen, as I mentioned earlier, had engaged in at least five different types of inequitable conduct. And the court made specific findings and conclusions on that, that he was the sole inventor and pro se applicant, the licensor and litigant for all the patents in suit, that he was a self-acknowledged expert in patent prosecution, that he had years of experience prosecuting and maintaining his patents, and that he was no stranger to the courts, that he had filed numerous cases at both the trial and appellate level. And so the court found that Mr. Nilsen was a very experienced litigator and that he had substantial experience before the PTO. So during the stage of prosecuting the patents, the court found that Mr. Nilsen was a very sophisticated applicant who knew what he was doing. But this court, I wasn't on the prior panel, but those who were apparently didn't quite share that view. Is that correct? Well, Your Honor, I guess I would not purport to tell the other members of the panel exactly how they viewed it, but the way I read it. It wasn't how they viewed it, it was what they said. Well, how I read the court's opinion, Your Honor, the only issue in which they said it was a close call was in the context of a discussion about Mr. Nilsen's intent on the small entity issue. I didn't see anything else in the opinion that suggested the court viewed it as a close call or that Mr. Nilsen didn't have the expertise that he purported to have. In fact, I would go back to the summary where the court indicated that it was such a collection of problems of repeated attempts to avoid playing square with the patent office that suggests Mr. Nilsen fully understood what he was doing and that the court's intent findings were fully supported. So with respect to the conduct at the PTO, I think the record fully supports the district court's finding that there was litigation, that there was an exceptional case and a position for an award of fees. But look at Mr. Nilsen's conduct after that. The court found Mr. Nilsen repeatedly not to be credible during the trial and that's an important factor that the court can consider. The court had the opportunity to observe Mr. Nilsen's demeanor and found that he was not a credible witness during the trial. And so that's an additional reason that the court identified in support of its decision to shift fees. Couple that with the litigation misconduct that the court identified and I would submit that you have a full record here, a broad record that supports the court's decision to award fees. And one thing I would like to emphasize on the fee award, this is not an issue of punishing Mr. Nilsen. This is an issue of remedying an injustice to an accused infringer who was forced to defend against a baseless suit in the first instance. And in fact, this court has said in the Mathias v. Spears case that the only deterrent to such baseless suits is Section 285. This is not about punishing Mr. Nilsen. It's about remedying the harm that Osram suffered by having to incur fees that it shouldn't have had to occur defending against a suit that Mr. Nilsen knew or should have known from the beginning was baseless because he was suing on patents that he had obtained by inequitable conduct. Your Honor, the district court here lived with this case for seven years. This court has repeatedly said that the district court is in the best position to weigh the factors that are relevant to an award of fees. That court has lived with the case. It's familiar with the litigants. It's in the best position to make that determination. During the time the district court lived with this case, it carefully considered all of Mr. Nilsen's misconduct before the PTO and his misconduct before that court. And based on the totality of the circumstances, the district court concluded that not only is this case exceptional, but that fairness dictates that the appellants pay Osram's fees. I would submit that that is fully supported by the evidence and consistent with this court's opinion. And, indeed, given the broad scope of Mr. Nilsen's misconduct, it's the only fair result. The only fair outcome here is that Osram should be, in fact, compensated for the fees that it was required to incur. Accordingly, the judgment below should be affirmed in its entirety, and unless the panel has any other questions, I thank you. Okay. Thank you, Mr. Sheehan. Let me just run over, if I could, the facts about the withdrawal of patents from the case. In April of 2003, when Mr. Nilsen was told he couldn't go up to 41 patents, they filed an amended statement of claims, a claims chart. It actually went, at that point, to 20 patents that they were pursuing. In November of 2003, there was an expert report filed that said we're going down to 13 patents. That was confirmed in the summary judgment brief and in the Markman brief that were filed in early 2004, that this is all we're talking about, those 13 patents. It is true that they didn't file a formal statement of non-liability until 2005, but during that whole entire period, it was very clear to the litigants that, at least from the point of view of our claims, we were down to 13 patents, and then went from 13 to 11 in the fall of 2005. So while maybe they can be faulted for not having gone through the formalities early enough, but the idea that there was a massive amount of additional burden imposed on the defendant as a result of having 26 patents instead of 13 patents during that period of time when all the depositions were being taken and the expert reports were being done is simply not factually accurate. He had, in fact, in multiple different ways, confirmed to Osram Sylvania that there were 13 patents that were at issue starting back in 2003. Now, in addition, we cited in our brief with respect to the notion that somehow it was unfair to start the case off without listing which claims he was specifically relying on. We cited in page 18 of our reply brief the law making it clear that it's not only permissible but customary not to cite specific claims in your complaint under notice pre-pleading. I believe Mr. Seavey doesn't contest that today. In addition, during that period of a couple of years up to 2003 that Judge Lurie was asking me about, the record makes clear that the case was largely dormant, that there wasn't a huge amount of attorney's fees being incurred by Osram Sylvania during that period of time. And so, at a minimum, you'd have to look and see whether there's any real substantial burden that was imposed by the fact that, pursuant to the schedule the district court announced, he was, in fact, not disclosing specific lists of claims until 2003. That said, let me just conclude by saying the Brasler case, which the district court relied on and which Mr. Seavey cited to you today, I think is an example of exactly what's distinctive about this case. In the Brasler case, the plaintiff had hidden an on-sale bar from the patent office and had, as a result of that, obtained a patent that otherwise would never have been issued. And the court said, quite properly, in a situation like that, where the plaintiff knowingly hides an on-sale bar and obtains a patent and then proceeds to try to enforce that patent, of course you would award all of the fees incurred by the defendant once the inequitable conduct is shown. Because if it wasn't for the inequitable conduct, there never would have been a patent and there never would have been a lawsuit. This case is nothing like that. If you look at the inequitable conduct, as I discussed before, that was found here, it does not begin to suggest that there wouldn't have been patent protection issued for these very important inventions. It wasn't, in fact, the inequitable conduct that caused the harm we're talking about today, which is the attorney's fees. So this is a case where the American rule makes sense, even though Congress has authorized the courts to make an exception in an appropriate case. Thank you very much. Okay. Thank you, Mr. Smith and Mr. Singh. The case is taken under submission.